Company, et al. Arguments not to exceed 15 minutes are tied. Mr. Serafini for the appellant. Good morning. I'd like to reserve three minutes for rebuttal, please. All right. Thank you, Your Honors. As Your Honors is aware, this is a long-term disability claim. My client was a long-time legal assistant for Dow Courting. Assisting the attorneys in both pre-trial and trial matters. And to start off with, I think that the primary issue that I have with the way that this situation has evolved is that there's a violation of Spangler v. Lockheed, 313 F3rd 356, because there has been a continuous cherry-picking of the records to support an end result in this matter. Melissa McKenna's job description is at page 1069 through 1072 of the record. It contains actually a number of generic statements about what she does. And there is not a lot of detail. Job duties, yes sir. There's not a lot of detail. The detail, frankly, is supplied and unrebutted from the statement submitted by Melissa McKenna, because she is the one who knows exactly what was happening on a day-in and day-out basis. Why didn't Ms. McKenna discontinue physical therapy? Ms. McKenna discontinued physical therapy because it was not working, and that's a great question, Your Honor, and I'm glad you asked it. Dr. Adams, you will note, nowhere in the records does he ever send her back to physical therapy after the discogram. Because physical therapy isn't going to resolve those issues. Her discs were herniated and torn. They're just torn apart. So physical therapy isn't going to put those discs back together. Dr. Adams, as a neurosurgeon, knew that. That's why he didn't order any more physical therapy. That's why the injections didn't work. She underwent those painful surgical procedures to have the injections in her spine. They didn't work either. So we don't just continue treatment to show that somebody is treating. The fact of the matter is he knew they weren't going to work. That's why he didn't order them. The previous doctors ordered that physical therapy prior to the discogram before they knew that this is the condition of these discs and they were never going to help her. Where's the February 23, 2013 date come from? Well, that's an interesting question. I'm glad you asked that as well. Dr. Adams, in his August 28, 2012 attending physician's report, had to give a response to a question that the defendant asked him. They said, when do you anticipate her return to work? Before the discogram was done, based on just what he had seen, he said, I anticipate her return to work February 23, 2013. And the strange thing is, lo and behold, that becomes the day that Dr. Rubin latches on to. Well, Dr. Adams said it should be February 23, 2013. The burden is on your client. So why not, why wouldn't it have been fair to say, okay, maybe that was random, and maybe it was slightly uninformed, but it was still her doctor, and that same doctor saw, I mean, that's really the heart of your case, that you have all this stuff in the fall that shows it's not going away, it's getting worse, you have all these problems. I just don't understand why it wouldn't be too much to ask to kind of correct that point. Well, Your Honor, the point was corrected. Explicitly? Yes, explicitly. It couldn't have been more explicitly corrected. So he said, I was wrong when I said last summer, she'll be fine on February 23. Did he say that? He didn't make that statement. But he did give a statement. But it's all the whole case. But he gave a statement in the record that could not be more clear, and it was after the disturbance. No, I just told you the way to make it the most clear. I don't think you can now say there's a way to make it more clear than that. I didn't mean to. I was wrong about February 23. I spoke too early when I said February 23. There's now all this new evidence, and that was just a mistake on my part. Your Honor, to make it that clear in hindsight would have been a terrific thing to do. But as we know, these are evolving cases. There's new tests being done. The discogram was new. All of these findings were new. And so what happened is, what does he do? The last objective test is the discogram, correct? Yes, and it is the definitive objective test. By the way, a test that the defendant agreed, established, that she was disabled. When they looked at that test, Dr. Rubin said, yeah, I agree, she's disabled. But he stuck on the February 23, 2013 date that was done back in August, even though there had been an intermediary statement by Dr. Adams saying, listen, this is exactly what's going on with this woman. In fact, for her to go back to work, she would put herself at risk of being crippled because she's going to damage what's already going on in there, and there's a lot of damage in there. How do you explain the reduced pain level and the steady and even gait that Dr. Rubin talks about? Well, the steady and even gait is an interesting red herring because the steady and even gait had always been the situation. So that wasn't a change. So to say that she got better because there was a steady and even gait, that's not true because nothing changed in that regard. The reduced pain level is pretty simple. She's on morphine. This is the situation. To keep her pain under control, she's on morphine. That's the level that her doctors had gotten her to. And I really can't imagine anything sillier than asking a legal assistant to come in and do quality work while she's on morphine. I wouldn't want my legal assistant doing that. I couldn't trust a thing that was done. But the fact of the matter is, saying that I came in on this particular day, March 11th, by the way, three days after we submitted our appeal and after I couldn't do anything more to supplement the record or explain the situation, that because her pain level had dropped by one point, that that means she got better while she's on morphine? Why isn't it fair for the company to point at the fact she didn't complete physical therapy? What other reasons were involved in her not completing physical therapy? Well, I think it's not that, A, she wasn't getting better and it wasn't doing her any good. She was actually, that type of therapy... She made that determination or Dr. Adams did? I think Dr. Adams ultimately made that determination because he never sent her back to any physical therapy. He never said to her, Ms. McKenna, listen, this is what's going on. I think physical therapy will help you. That was absolutely not done. Don't you argue something about a reason being given that something was wrong with her son or son was ill? I did not make that argument in my brief. I don't recall making that argument in my brief, and maybe I did. She does have boys that she's raising, but the fact of the matter is that that level of damage in her spine was not going to be taken care of by physical therapy. It just wasn't. Isn't your best argument about this February 23, 2013 date is that that date was mentioned by Dr. Adams that it first came from him and that subsequent to February 23, Dr. Adams never cleared your client to return to work? That's true, and in fact in the statement he went beyond that and explained in specific detail exactly why she couldn't go back to work and exactly what would happen to her if she went back to work based on his opinion as a neurosurgeon who's an expert in that area. The thing that I want to point out to this Court is in regards to this whole thing, when you look at it, there was one review here. The initial decision was that we had not established that she had objective evidence to back up the restrictions placed on her by Dr. Adams originally. When we filed our appeal, I presented them with that objective evidence. They agreed that the objective evidence was sufficient to establish she was disabled. They latch onto the February 23, 2013 date from back in August before that objective test was done, and then they turn around and after granting the benefits, revoke the benefits of that day. And I ask, what changed? And the answer is there's nothing in that reticulate that indicates anything changed. That nothing happened between February 23 and February 24 that magically made her able to go back to work. Those disks were not going to get untorn. They don't get untorn. And that's what Dr. Adams is saying in his record. So the problem with that is it ties into our argument that this really violates the Kalish case. Was surgical intervention discussed with your client and was she considering it? Surgical intervention was discussed with the client. A Dr. Adams specific indication is she's too young to do this right now. This is not in her best medical interest to have a surgery right now at this age. He's going to hold off and continue to manage it. She's in her 40s. And I'm sorry, I don't know the exact age, but she's a relatively young woman to have this much damage. But it usually comes on would be something you'd see this later on. But she has a lot of damage at that age. And he's managing it, trying to, I would suggest, get her by until she gets to the point where, okay, it's reasonable to have this surgery now because of the stage of your life that you're at now and how much life he perceives her to have left and knowing how long these surgeries last. Was she treated conservatively by Dr. Adams? I would say that Dr. Adams is treating her conservatively. The fact of the matter is that he saw the issues on the discogram. He saw what was going on with her and he said, listen, we're upping you to morphine. This is what's going on. You cannot do this, that, and the other thing. Did the doctors say don't do physical therapy? Dr. Adams specifically never ordered the physical therapy. He didn't say, I don't want you to do physical therapy, but people don't order their own physical therapy with all due respect, Your Honor. The doctors do it. And Dr. Adams, when he took over her care, never ordered physical therapy. He did not see a condition that was going to be benefited by that. And he never ordered it. So what is she to do? She's supposed to go get physical therapy when her neurosurgeon, the guy who's taken over, a specialist now who's taken over her care, has said this isn't going to work. She had therapy ordered by other doctors who weren't specialists in this area. And she did see a kidney doctor to see if that was the cause of the problem, and he correctly said it wasn't. But fishing around doing this stuff as you continue to get these tests, when you saw that it wasn't working, then you get the discogram, that's why Dr. Adams didn't order it again. He didn't order it from August on. So this is really, this not going to physical therapy is really a red herring. And it's really a red herring for this reason also. They agreed she had established that she was disabled through February 23, 2013. That was long after the issue with going to physical therapy. And remember, the basis for the denial was that we hadn't established an objective rationale, an objective test to back up the restrictions placed on her by Dr. Adams. After that discogram was done, they agreed we did that, and nothing changed in her condition after that. Then they revoked the benefits, and they don't explain what changed. And that's the very nature of the Kalish case. They just made a conclusive restatement that it should have been February, two and a half months, should have been enough to have this problem take care of itself, although I don't know how because those discs are not going to un-tear. But that's the conclusive restatement. And beyond that, there's a paucity of evidence in the record to establish that she remained disabled. Well, I can't appeal again. And that's the unfairness of this situation. I don't get another appeal. Generally, this works. You send me a letter. You tell me what the story is. Here's the problem we have with what you've submitted. Then I have an opportunity to correct that problem. But in the revocation, we didn't have that opportunity to correct the problem. It was a very clever way of saying we're going to pay benefits for a little bit of a period of time, and then we're going to cut her off forever because we're never going to give you another appeal. Well, I mean, her doctor facilitated that with the initial assessment for what it's worth. You could have corrected that. Well, in all fairness, when he made that initial assessment, as you correctly said, it was an estimation based on a report, but he issued a subsequent report. Let's say for the sake of argument you win. Would it be problematic from your perspective in this area of the law to say, but, you know, in the normal course, when the claimant's own doctor makes an estimate as to when they're going to be able to go back to work, that's usually going to be controlling. And if the doctor, after subsequent tests, wants to decide that estimate is wrong, the doctor's got to explicitly correct that. Would that be a terrible thing to say for the law, even if you won? I know you want to win. That's important. But for future cases, why wouldn't that be a good rule? The problem that I have with the way that these things go in regards to that, Your Honor, is that I don't control this doctor. He's not a hired gun to me. He's just a treating physician. I mean, I love how candid you're being, but he says what he says. And if he wants to say he was wrong, subsequent tests proves he's wrong, he should say that. And I submit to Your Honors, with all due respect, that his subsequent letter, which is in the record, and his subsequent statement, more importantly, does exactly that. It's not as clear as you want it to be, but I believe if you look at it and say, what does this really say, that's what it says. After the discogram results, he says, I'm going to follow up in March. Does he not? He actually saw her in December, and then he said he was going to follow up in March. And nothing changed in either one of those. He said she still had the disabling condition. She still couldn't do those things, and she was still on morphine. And his reports have never changed in that regard. They really haven't. Thank you, Your Honors. I appreciate it. Good morning, Your Honors. May it please the Court, my name is Elizabeth McDuffie, and I represent Dow Corning Corporation Long-Term Disability Plan and the Aetna Life Insurance Company, the appellees. The Court should affirm the decision of the District Court. In this particular case, Ms. McKenna was required to meet the standard under the plan that she be unable to perform material functions of her own occupation. She failed to meet that standard. How? Because Ms. McKenna's job was an administrative assistant in a law department. She was required to photocopy, make appointments for attorneys, those type of things. The decision that Dr. Adams issued relative to her ability to do that job was based on an incorrect understanding of what her job entailed. He, in his statement that the That wasn't part of her job. He didn't say she was required to lift more than ten pounds. He said he was restricting her not to lift more than ten pounds. That's correct. But in the statement he also says she can lift no greater than ten pounds, which was something that had been communicated to him that was inaccurate. That wasn't part of her job description. But he didn't say that that was part of her job description. That's correct. So if that wasn't part of her job, and he said that she couldn't do more than lift greater than ten pounds, but she didn't lift greater than ten pounds, then it wasn't something that she should have been restricted by. We all bring boxes of files with us, and those are heavy files, and generally back at the office, a legal assistant is the one that's going to Well, if she needed assistance for lifting, it's not a requirement of her job. But assuming she had to lift a box, certainly there would be someone who could assist her in doing it. I also work in a law office as well, and to the extent we have assistants who have lifting restrictions, we have someone just do the lifting on their behalf. If it's not part of their job description, and it wasn't, we didn't hire them and say as part of what you do, you have to be able to lift ten pounds or more. And so when someone says they can't do it, or it's not part of their job description, we just have someone else do it on their behalf. How did Dr. Rubin establish the February 23rd date? I don't think there was anything magical. I think what he did is he looked at, and the appellant keeps referring to the August 28th, 2012 information provided by Dr. Adams. There was actually subsequent information provided that Dr. Rubin based its decision on whether or not she could come back to work as of February 23rd, 2013. That was the December 3rd, 2012 report submitted by Dr. Adams. And he said it would be reasonable that in the two-and-a-half-month period, she should be able to, based on the medical documentation, be able to return to work. And he didn't understand why she couldn't. There were no functional limitations listed after that point that would prevent her from performing her job. Dr. Adams said he didn't understand why she couldn't. No, Dr. Rubin, in reviewing the medical documentation, established a date. He said it would be reasonable in two-and-a-half months that the conditions that were listed and the restrictions that he reviewed... And didn't that also rely on, and I'm sorry for being so pointed, but didn't it also rely on a report of pain at a level three and the steady and even gait thing? No, because in the December... Didn't it overlook a positive straight leg test in the last evaluation? The one in which Dr. Rubin made the decision that she could return to work as of February 23rd, that report actually her pain level was a four, and it actually didn't have a language steady and even gait. It had an abnormal gait as well. And would morphine affect that? Well, there was no adverse medication effects listed in any of the reports that Dr. Adams submitted. There was a specific question in each of the office visit notes, and in each of those notes, the answer was no. Are there any adverse medication effects? And the answer was no. Well, but I'm not talking about adverse medication effects. I'm saying would it affect her pain level? I mean, hopefully you would want the pain medication to suppress it to some degree. Absolutely. It would diminish the pain level, yes. Was she on morphine for how long? I don't know the exact length that she was on morphine for, but obviously it would depend on how that morphine would impact her. Pain medication impacts people differently, each individual differently. So to the extent there was some impact, you would have thought it would have been noted in the record somewhere. Dr. Adams never did note that. I'm actually thinking about it from a different perspective. That's about as serious pain medication as you get. Doesn't that suggest there's some pretty serious pain underlying it? I don't think that we're questioning her pain level, because that would go to the credibility issue of questioning the level of her pain. I don't think there's any question of the level of her pain. The termination and the definition under the plan speaks to functionality, whether or not she could perform her position, material duties of her own occupation. Your point that, hey, February 24th, fine, just bring the morphine, you'll be good. Well, in any case in which someone has a medical condition, to the extent that medication will diminish the impact of the condition on the individual and allow them to form, function, if it's a job or just function in need. The answer is yes? Yes. Bring your morphine. That's your answer? Yeah, if you have to, sure, you bring your medication to work and take your medication. So what happens on February 24th if she still needs morphine? Your view is she should come back to work with the morphine? But the level of pain that's documented in the March 11, 2013 statement from Dr. Adams is a level 3 of pain. That goes back to Judge Watson. Is that because she was on morphine? But we have to, when the plan is doing an evaluation of whether or not, based on the medical documentation provided by her treating physician, it's looking at what's provided by the doctor. The participant has the obligation to establish whether or not they are entitled to benefits under the plan. Would you agree that if someone needs morphine, they're disabled, I don't care what the job is? No one says, just take the morphine at work, do they? Yes, and to the extent that, yes. Yes, you do. You say, just take the morphine. Well, in this particular case, if Dr. Adams continued to prescribe her morphine to take, and that alleviated or diminished her symptoms and allowed her to work, I guess I'm misunderstanding the question in terms of why that would be something that, if it allowed her to work and go back to work and perform her job. If that was in fact the case, then wouldn't there have been something listed in the medical records about disorientation, no driving, something that would have indicated? Well, no, she wasn't at work, so that documentation would not have been created. She wasn't at work with morphine, and for good reason, probably. But in the office visits notes, wouldn't there have been some identification when the question was asked, are you having any adverse effect from the medication, there would have been something noted about those type of things. That is, it causes me to be disoriented. Well, that's not a problem with the medication. The medication typically causes those kinds of responses, from what I understand. Lesser pain medications do. Yes, depending on the individual, you're absolutely correct. And the standard listed, if you look at morphine, or you look at Vicodin, or you look at Oxycodone, you will see that there are adverse effects from the medication. But it says, dependent on. It may cause these things. My problem is the complete other direction. I was on morphine twice, for 24 hours after I had each hip replaced, and it was the most euphoric experience I've ever had. I cannot imagine. I called into work the day after. I said, I'm ready to go. Let's start working. It would have been a terrible idea for me to actually work on that morphine. I felt great. There were no adverse side effects. I loved it. It was the first time I ever understood addiction. But I just cannot believe, if someone's on morphine, they're not disabled. But in terms of making a determination under a plan, we don't make a determination just saying that you list this medication, and automatically we say, well, you must be feeling this way, or you must feel that way. Wouldn't it have been incumbent upon her health care provider to identify that as the reason why she was no longer able to perform the functions of her own occupation? Didn't he say, though, didn't Dr. Adams say that a return to work may lead to paralysis? He said that a return to work may, yes, may cause additional damage, could cause additional damage. So if you're on pain medication, and you have a bulging or ruptured disc, and you step wrong, you may not feel it initially, but it may lead to permanent damage, correct? He did say, yes, if she continues her job, but part of that analysis that he provided was with the understanding that the two things that she was not required to do, if you look at his statement that he gave, he said that she drove in an office meeting. She had to drive to meetings out of the office. That wasn't part of her job. She did not have to drive to meetings out of the office. She did not have to lift greater than 10 pounds. Yes, she certainly could have. Those weren't requirements of her job. They weren't part of her job descriptions. She did photocopying. She made appointments for the attorneys. She did bait stamping. She did filing, those type of things. Those were the requirements that are listed in the job description that's provided in the administrative claim file. Those were the items provided. What changed between the 23rd of February and the 24th? I don't know that anything changed between the 23rd and the 24th. I don't think. Dr. Rubin said that he expected that the symptoms that she was exhibiting would resolve by the 23rd, and so that of the 24th she would be able to go back to work. When he received the March 11th, 2013 statement from Dr. Adams, nothing in that statement changed his opinion. There were two opinions rendered by Dr. Rubin in this case. He rendered an initial opinion before he got the March 11th, 2013 opinion, and then once he got additional medical documentation, he looked at that as well and said, nothing changes my opinion, and so he rendered two separate opinions. In fact, he attempted to call Dr. Adams nine times to get Dr. Adams' input on his conclusions. He wanted to ask, what in the medical records, what would cause her not to be able to perform the functions of her job? In the report, he actually submitted the questions that he wanted Dr. Adams to answer, and Dr. Adams never responded. The reports were sent to him twice. The initial report and the addendum report were sent to Dr. Adams, and he never responded to those reports. He also never responded to the telephone calls. Did Dr. Rubin ever request to be able to examine the plaintiff? He did not. He was asked to do a peer review report, and I think had he had a chance to speak to Dr. Adams, maybe that would have been the next step. I don't know. I'm only guessing at that, but it seems to me that her doctor, in scheduling two times to speak with Dr. Rubin and not following through on those scheduled times, and then additional calls made to him. Given the injuries and alleged disability of this seriousness, was there any particular reason the insurer didn't request an actual examination of the plaintiff? In these cases, what happens is there's a review of the administrative claim file and a determination made whether a peer review will be sufficient. And as I said, perhaps after a discussion with Dr. Adams, had there been some additional need for additional information, a physical examination could have been scheduled at that time. But at the initial stages of the review, a peer review was what was scheduled. Of course, Aetna can't control Dr. Adams or anything along those lines, but it could have required an examination by a physician retained by the insurance company had it seemed fit to do that, and she would have had to submit. That is correct. The plan had a provision that Aetna could have required that she submit to a physical examination. Wouldn't that have been the better course here? I don't think so. I think a peer review report in this case was sufficient. Is that a different way of approaching the situation? Obviously, yes, but where a peer review report reviews all of the medical records and makes a determination, if the treating physician, again, disagrees with the peer review report, he has an opportunity to do so. He had two opportunities. Are they truly peers? They're not in the same medical category, no. The first review was by a nurse, correct? Yes, that was at the initial stage. Dr. Rubin overrode that and allowed for the 23rd, correct? Yes, he allowed for benefits for at least five months, roughly about five months. Wouldn't you agree that it sure looks like Dr. Rubin settled on February 23rd because that's the date that Dr. Adams initially came up with? Yes, part of the suggestion that that was the date that Dr. Adams provided, I'm sure had an impact on Dr. Rubin coming to that conclusion. Although, as I said, there was additional information submitted after that that Dr. Rubin didn't change his opinion and neither did Dr. Adams. He didn't submit any additional information, at least in return of the office visit notes, that indicated that anything should change from that date. The company received additional reports and evidence, I think, from Dr. Adams that were not considered because you'd already made your decision, correct? Yes, that was well after the fact, yes. The decision that was made in May, there was additional information submitted in June. Actually, that information, the lawsuit had already been filed, and then that information was submitted by Dr. Adams. Thank you, Counsel. Your Honors, I'll just respond to a couple of things. You had some questions that I want to clear up. You asked about the issue of travel. On the administrative record at page 1069, it specifically says that Ms. McKenna must assist with the preparation of mediations, such as organizing collected needed documents for the preparation of the mediation and attending mediations with the attorney. That's just in the brief couple of minutes that I had to run through this real fast. The fact of the matter is she does travel. You asked when she was on morphine. How long was she on morphine? Administrative record, page 265, that's the original report from Dr. Adams from August 28th of 2012. She was on morphine at that time, Your Honors. The game plan, like I said before, of thinking that someone is expected to walk around at work, get these files, get them to the attorneys and do all this stuff while you're on morphine. When Dr. Adams said two times, two separate times, with no uncertainty on administrative record, page 285, this October 3, 2012 letter says that if she were to return to work, she may cause further damage to her spine, which could lead to permanent nerve damage or paralysis. And he said the same thing in his statement that was also submitted as part of the record. So the defendant overlooks all of those things. They overlook the straight leg test that was positive and worse than it was. They overlook the other findings in the December 3, 2012 exam. She had trace reflexes, trace. That means they were almost non-existent. And they overlooked the fact that he said her medical conditions or problems had not changed. She was on morphine in August. She was never off the morphine. And that's the only way that they're controlling her pain to expect someone to work in that situation where you are not functioning the way that you function normally. I really cannot respond to that because I'm not involved in that. Part of the problem with the way this whole thing went down is that we submit our appeal on March 8. I mean, I assume Dr. Rubin's telling us the truth. And that puts Dr. Rubin in a bit of a bind in terms of accounting for all of this. I am not saying that Dr. Rubin is incorrect. I don't know whether Dr. Rubin is incorrect, so I would never say that. I'll presume that he was correct as a physician that he wouldn't make that up. But here's the problem. There's two separate things that go on. We filed an appeal based on the denial and the rationale that we were given. We were successful in that appeal. And then they turned right around the next day and revoked the benefits without giving us an opportunity to supplement the record. Here's what happens. If you give me that letter and say you haven't proved that you were still disabled when you submitted your appeal, then I would have turned around and said, okay, let me meet the requirements. Let me meet the deficiency that you guys have pointed out to my client. And we would have taken care of that matter in that fashion. And he was never given the opportunity. We were never given the opportunity to do that. And that's the problem I have with the way this went down. Thank you. Thank you very much. The case is submitted. And you may call the next case.